IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ALLIED NEVADA GOLD CORP., et al., | ) | Bankr. No. 15-10503-MFW |
| | ) | |
| Reorganized Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | |
| AD HOC COMMITTEE OF SHAREHOLDERS, | ) | |
| | ) | |
| Appellant, | ) | Civ. No. 15-946-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| ALLIED NEVADA GOLD CORP., et al., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |
| BRIAN TUTTLE, | ) | |
| | ) | |
| Appellant, | ) | Civ. No. 15-949-SLR |
| | ) | |
| v. | ) | |
| | ) | |
| ALLIED NEVADA GOLD CORP., et al., | ) | |
| | ) | |
| Appellees. | ) | |

---

[1]The Reorganized Debtors are: Allied Nevada Gold Corp. (n/k/a Hycroft Mining Corp.); Allied Nevada Gold Holdings LLC; Allied VGH Inc.; Hycroft Resources & Development, Inc.; and Victory Exploration Inc.  ANG Central LLC, ANG Cortez LLC, ANG Eureka LLC, ANG North LLC, ANG Northeast LLC, Allied VNC Inc., Hasbrouck Production Company LLC, Victory Gold Inc., and ANG Pony LLC, Debtors in the Chapter 11 cases, were dissolved after the October 22, 2015 effective date. (*See* Civ. No. 15-946-SLR at D.I. 16 n.1)

Jordan Darga, Groveland, Florida; Brian Tuttle, Sarasota, Florida; and Stoyan Tachev, Sofia, Bulgaria: Ad Hoc Committee of Shareholders. Brian Tuttle, individually, Sarasota, Florida. Pro Se Appellants.

Michael D. DeBaecke, Esquire, and Stanley Byron Tarr, Esquire, Blank Rome LLP, Wilmington, Delaware. Counsel for Appellees.

## MEMORANDUM OPINION

Dated: September 15 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Appellants ad hoc committee of equity security holders ("ad hoc committee") (consisting of Jordan Darga ("Darga"), Brian Tuttle ("Tuttle"),[2] and Stoyan Tachev ("Tachev")) and Tuttle, individually, all appearing *pro se*, filed these bankruptcy appeals on October 19, 2015 and October 21, 2015, respectively. (Civ. No. 15-946-SLR at D.I. 1; Civ. No. 15-949-SLR at D.I. 1) The appeal in Civ. No. 15-946-SLR, arises from an order entered in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") in *In re Allied Nevada Gold Corp.*, Bankr. No. 15-10503-MFW (Del. Bankr.) ("Bankr. No. 15-10503-MFW") on October 8, 2015, that confirmed debtors' amended joint Chapter 11 plan of reorganization ("confirmation order").[3] (*See* Bankr. No. 15-10503-MFW at D.I. 1136) The ad hoc committee seeks reversal of the order. The appeal filed by Tuttle in Civ. No. 15-959-SLR, arises from several orders entered in the Bankruptcy Court including the October 8, 2015 confirmation order, an August 28, 2015 order approving the disclosure statement for the amended plan ("disclosure statement order") (*id.* at D.I. 940), an order approving debtors' sale of certain non-core assets ("sale order") (*id.* at D.I. 606), and a September 15, 2015 order denying a motion

---

[2]Tuttle is a former holder of now canceled common stock of debtor Allied Nevada Gold Corp.

[3]Because the parties briefed *Ad Hoc Committee of Shareholders v. Allied Nevada Gold Corp.*, Civ. No. 15-946-SLR, and *Tuttle v. Allied Nevada Gold Corp.*, Civ. No. 15-959-SLR, together, both appeals will be addressed in this memorandum opinion. Tuttle has another bankruptcy appeal pending in this court, *Tuttle v. Allied Nevada Gold Corp.*, Civ. No. 16-058-SLR, filed February 1, 2016. Tuttle has filed motions to consolidate the appeals, opposed by appellee. (*See* Civ. No. 15-946-SLR at D.I. 26; Civ. No. 15-949-SLR at D.I. 32; Civ. No. 16-058-SLR at D.I. 18) The motions to consolidate will be denied and, therefore, the appeal in Civ. No. 16-058-SLR will be addressed separately.

to appoint an examiner in the Chapter 11 cases ("examiner denial order") (*id.* at D.I.

995).  Tuttle also seeks reversal of the confirmation order.  The court has jurisdiction to

hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a).

## II. BACKGROUND

### A. Chapter 11 and Restructuring Agreement

Reorganized debtors are a U.S.-based gold and silver producer that operates in

the State of Nevada.  (*See* Civ. No. 15-946-SLR, D.I. 16 and Civ. No. 15-949-SLR, D.I.

32 at 6)  On March 10, 2015 ("petition date"), debtors filed a voluntary petition for relief

under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the

Bankruptcy Court.  As of the petition date, debtors had approximately:  (1) $340 million

of secured indebtedness in the form of borrowings and issued letters of credit under

(a) a secured credit agreement, (b) a term and security deposit loan agreement, (c)

capital lease and term loan agreements, (d) swap agreements, and (e) a promissory

note; and (2) $350 million of unsecured debt in the form of (a) senior unsecured notes

issued pursuant to an indenture, and(b) trade debt.  (*See* Bankr. No. 15-10503-MFW at

D.I. 16, ¶¶ 12-24)

Prior to the petition date, debtors negotiated the terms of a consensual

restructuring transaction with the holders of 100% of debtors' funded secured debt and

approximately 67% of debtors' unsecured notes.  (*Id.* at D.I. 16, ex. 2)  On the petition

date, debtors entered into a restructuring support agreement ("RSA").  (*See id.*)

On March 19, 2015, the United States Trustee for Region 3 ("U.S. Trustee")

appointed a creditors committee in the Chapter 11 case pursuant to Bankruptcy Code

2

§ 1102, and on April 10, 2015, appointed a committee of equity security holders, also pursuant to § 1102 of the Bankruptcy Code. (*Id.* at D.I. 95, D.I. 157) The equity committee's membership was reconstituted from time to time subsequent to its formation. (*Id.* at D.I. 371, D.I. 449) The equity committee and creditors committee were dissolved on the October 22, 2015 effective date ("effective date") in accordance with the terms of the amended plan and confirmation order. (*See* Bankr. No. 15-10503-MFW, D.I. 931, at 35, Art. IV, § 4.14)

## B. Sale Order

On March 31, 2015, debtors filed a motion seeking Bankruptcy Court approval of a proposed sale of certain non-core exploration properties and related assets ("sale assets"), along with related bidding procedures and entry into a stalking horse purchase agreement with Waterton Global Resource Management ("Waterton") that secured a $17.5 million cash bid for the sale assets. (*Id.* at D.I. 133) Debtors' financial advisor, Barak M. Klein ("Klein"), stated that the sale was "in the best interests of debtors and their estates because the debtors were not able to commit the time and capital to effectively monetize the sale assets through their own operations, and the proceeds from the sale would allow debtors to satisfy, in whole or in part, an obligation under the original RSA. (*Id.* at D.I. 133, ex. D at ¶ 12)

The Bankruptcy Court approved entry into the stalking horse purchase agreement and the proposed bidding procedures. Thereafter, debtors engaged in a marketing process through their financial advisor, Moelis & Company LLC ("Moelis"), and contacted 53 different parties. (*Id.* at D.I. 575 at ¶¶ 7, 12, D.I. 606) Three of the

parties signed non-disclosure agreements to participate in the bidding process and were provided with the same materials and information as the stalking horse bidder. (*Id.* at D.I. 572 at ¶¶ 13, 14)  At the close of the bid deadline, debtors received no additional bids for the sale assets.  (*Id.* at D.I. 570)

The equity committee filed an objection to the sale motion (*see id.* at D.I. 554, D.I. 597), but withdrew the objection after it conducted "extensive fact-finding as to the merits" of the sale, the "value of certain" of the sale assets, and "alternatives" to the sale, concluding that it could not find an alternative transaction that would assure a greater return to debtors.  (*Id.* at D.I. 597)  An evidentiary hearing on the matter was held on June 18, 2015, and the Bankruptcy Court approved the sale motion over Tuttle's objection.  (*Id.* at D.I. 606, 607).  Tuttle filed a motion for reconsideration of the order on July 28, 2015, after the sale had been consummated.  (*Id.* at D.I. 643, D.I. 773)

## C. Debtors' Plan and Amendments to the Plan

On April 24, 2015, debtors filed a joint Chapter 11 plan of reorganization and disclosure statement.  (*Id.* at D.I. 251, 252)  The plan of reorganization proposed a recovery to holders of canceled common stock, contingent on the class of such holders voting in favor of such plan, in the form of warrants that could convert into 10.0% of the new equity in the reorganized debtors.  (*Id.* at D.I. 251 at § 2.16)  The equity committee indicated it intended to object to the plan of reorganization's proposed treatment of holders of canceled common stock, and sought discovery related thereto.  (*Id.* at D.I.

4

506 at ¶ 10) Debtors provided discovery to the equity committee. (*See* D.I. 793, ex. C at ¶¶ 8-12)

Following the filing of the plan of reorganization, debtors' business was negatively affected by numerous factors that severely impeded its mining operations including: (1) high employee turnover; (2) refusal by key vendors to contract with debtors on commercially reasonable terms; (3) gold and silver production levels failing to meet expectations; and (4) continuing decline in gold prices. (*See id.* at ¶¶ 6-7) On July 8, 2015, debtors commenced a plan to suspend mining operations at their sole revenue- generating mine, the Hycroft Mine, and terminated approximately 230 of the remaining 368 employees. (*See id.* at D.I. 919 at 17-19; D.I. 1100 at ¶¶ 10-12) According to appellees, due to the plan to suspend mining operations, debtors were unable to comply with several covenants and milestones in the RSA and, as a result, the RSA parties had the right to terminate the RSA. (*See* Civ. No. 15-946-SLR, D.I. 16; Civ. No. 15-949-SLR, D.I. 22 at 9) Thereafter, debtors negotiated certain amendments to the original RSA ("amended RSA") with the RSA parties and, on August 27, 2015, the Bankruptcy Court approved debtors' assumption of the amended RSA. (*Id.* at D.I. 926)

On July 23, 2015, debtors filed an amended joint Chapter 11 plan of reorganization and disclosure statement, both of which reflected the agreements reached in the amended RSA. (*Id.* at D.I. 756, 758) The amended plan of reorganization proposed no recovery to holders of canceled common stock. (*Id.* at D.I. 756 at § 2.14)

### D.  Global Settlement

On August 19, 2015, debtors and RSA parties announced they had reached a

settlement ("global settlement"), with the remaining major constituencies in the Chapter

11 cases not parties to the amended RSA - the creditors committee and the equity

committee.  (*Id.* at D.I. 864)  On August 27, 2015, debtors filed a second amended joint

Chapter 11 plan of reorganization ("amended plan") and a second amended disclosure

statement ("amended disclosure statement") that reflected the global settlement.  (*Id.* at

D.I. 931, D.I. 933)  The amended plan proposed to provide debtors':  (1) secured

creditors a distribution in the form of new secured debt in the reorganized debtors ("new

first lien term loans"); (2) unsecured creditors the option to receive a cash recovery or to

receive privately traded common stock in the reorganized debtors ("new common

stock"); and (3) canceled common stock holders a distribution in the form of new

warrants.  (*Id.* at D.I. 931 at Art. II)  The creditors committee and equity committee

supported confirmation of the amended plan.  (*Id.*)

 On August 28, 2015, the Bankruptcy Court entered the disclosure statement

order.  (*Id.* at D.I. 940)  On September 8, 2015, on behalf of the ad hoc equity

committee holders of canceled common stock, Tuttle filed an objection to debtors'

notice of hearing with respect to the amended disclosure statement.  (*Id.* at D.I. 969)

### E.  Examiner Motions

On August 11, 2015, Tuttle filed a motion to appoint an examiner, joined by

Darga.  (*Id.* at D.I. 819, 957 at n.1)  Debtors, the creditors committee, and an ad hoc

group of noteholders objected to the motion.  (*Id.* at D.I. 957, 958, 960)  The equity

committee also submitted a response to the motion and stated that it had "analyzed a multitude of potential claims against debtors, debtors' directors and officers, and third parties . . . . weighed its valuation analysis, operational analysis, and analysis of certain potential claims" and, based on its analysis, it "believes that the proposed [amended] plan provides existing equity holders with the best opportunity for a recovery given debtors' current circumstances." (*Id.* at D.I. 961, ¶ 2, 4)

Following a September 15, 2015 evidentiary hearing, the Bankruptcy Court entered an order that denied the motion to appoint an examiner. (*Id.* at D.I. 995, 1021) Tuttle filed a second motion to appoint an examiner on October 5, 2015, one day prior to the hearing to consider confirmation of the amended plan. (*Id.* at D.I. 1110) On January 20, 2016, after the notices of appeal in the instant cases were filed, the Bankruptcy Court denied the second motion to appoint an examiner on the grounds that the "second examiner motion is no different from [the] first examiner motion" and that confirmation of the amended plan on October 8, 2015 precluded the appointment of an examiner under the Bankruptcy Code. (*See* Civ. No. 15-946-SLR, D.I. 18 and Civ. No. 15-949, D.I. 24 at ex. 18 at 76:17-18; Bankr. No. 15-10503-MFW at D.I. 1372)

## F. Confirmation of the Amended Plan

On September 24, 2015, Tuttle and Darga objected to the amended plan on the grounds that the amended plan undervalued debtors and that holders of canceled common stock were entitled to an additional recovery beyond the new warrants. (Bankr. No. 15-10503-MFW at D.I. 1048, D.I. 1049, D.I. 1114) A confirmation hearing was held on October 6, 2015. Testifying on behalf of debtors were Stephen M. Jones,

7

debtors' chief financial officer ("CFO"), and Klein. (*Id.* at D.I. 1149) Klein testified that the going concern enterprise value of the reorganized debtors, as of October 31, 2015, was in a range between $200 million and $300 million ("Moelis valuation"). (*See id.* at D.I. 1100) The Moelis valuation placed holders of canceled common stock out of the money by at least $350 million. (*Id.*) Tuttle cross-examined each of debtors' witnesses, (*see id.* at 16-32, 58-66, 70-89, 120-123), and Darga cross-examined debtors' CFO (*see id.* at 53-58*)*.

Appellants objected to the amended plan, but did not proffer any witnesses or offer any competing valuation of debtors at the confirmation hearing. (Civ. No. 15-946-SLR, D.I. 18 and Civ. No. 15-949, D.I. 24 at ex. 17) Appellants argued that the Moelis valuation was too low and should be increased to enable greater distributions to holders of canceled common stock. (*See id.*)

In entering the confirmation order on October 8, 2015, the Bankruptcy Court found that the Moelis valuation was "reasonable, persuasive, credible and accurate." (*Id.* at D.I. 1136, ¶ 56) In response to appellants' objection to the recovery to holders of canceled common stock, the Bankruptcy Court explained that the "[appellants'] representative, the [e]quity [c]ommittee, has already negotiated the terms of the warrant on your behalf." (*Id.* at D.I. 1149 at 160:21-23) Finally, the Bankruptcy Court overruled Tuttle's oral motion to stay the confirmation hearing that he made at the confirmation hearing. (*Id.* at 114:23-24)

8

### G. Amended Plan Implementation

On the October 22, 2015 effective date, the amended plan was consummated,

and the reorganized debtors emerged from Chapter 11. (*Id.* at D.I. 1190)  According to

Jones, executive vice president, secretary, and CFO of Hycroft Mining Corp. (f/k/a Allied

Nevada Gold Corp.) as well as CFO of the other reorganized debtors, the consumma-

tion of the amended plan triggered the following transactions and events:  (1) debtors

(i) repaid a portion of certain prepetition debt instruments and other secured obligations,

and the DIP facility, (ii) rejected, among other things, certain capital lease obligations,

and (iii) eliminated all then existing liens; (2) the reorganized debtors were formed and

appointed their boards of directors and adopted new organizational documents; (3) the

reorganized debtors dissolved certain prior business entities; (4) pursuant to a new

credit agreement, the reorganized debtors incurred $126.7 million of new first lien term

loans and have repaid approximately $780,000 of the new first lien term loans pursuant

to terms of the credit agreement; (5) the reorganized debtors entered into a new

indenture and issued approximately $95 million of new second lien convertible notes,

since the effective date have issued an additional $15 million of new second lien

convertible notes and, based on lending commitments from existing holders of such

notes, the reorganized debtors have called for funding of an additional $5 million of new

second lien convertible notes; (6) the reorganized debtors effectuated an interim

distribution of new common stock to holders of allowed general unsecured claims

entitled to receive such stock under the amended plan, reserved the remainder of such

stock for distribution pending further claims reconciliation, entered into a stockholders

agreement with the recipients of the new common stock and, to date, at least one

9

shareholder has received the reorganized debtors' approval (as required by the

stockholders agreement) to trade the new common stock to a third party; (7) the

reorganized debtors issued 100% of the new warrants to holders of the canceled

common stock and holders of subordinated securities claims (as defined in the

amended plan), and entered into the associated new warrant agreement (as defined in

the amended plan); and (8) the reorganized debtors distributed approximately $1.8

million of cash to satisfy (i) allowed Bankruptcy Code § 503(b)(9) claims, and

(ii) cure obligations with respect to assumed executory contracts and unexpired leases.

(*See* Civ. No. 15-946-SLR, D.I. 19 and Civ. No. 15-949-SLR, D.I. 25 at ¶ 3)

## III. STANDARD OF REVIEW

In undertaking a review of the issues on appeal, the District Court applies a

clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary

standard to that court's legal conclusions. *See American Flint Glass Workers Union v.*

*Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law

and fact, the District Court must accept the Bankruptcy Court's "finding of historical or

narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the

[Bankruptcy] Court's choice and interpretation of legal precepts and its application of

those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945

F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669

F.2d 98, 101-02 (3d Cir. 1981)). The District Court's appellate responsibilities are

further informed by the directive of the United States Court of Appeals for the Third

Circuit, which effectively reviews on a *de novo* basis Bankruptcy Court opinions. *See In*

10

re *Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d

Cir. 2002). A factual finding is clearly erroneous when "the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been

committed." *In re Cellnet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citing

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Findings of

fact, whether based on oral or documentary evidence, shall not be set aside unless

clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy

court to judge the credibility of the witness." Fed. R. Bankr. P. 8013.

## IV. ISSUES RAISED ON APPEAL[4]

The ad hoc committee of shareholders raise the following issues for review:[5]

(1) Whether the Bankruptcy Court committed an error of law or an abuse of

discretion in overruling Tuttle's August 11, 2015 motion to appoint an examiner with

access to and authority to disclose privileged materials through its order entered on

September 15, 2015 (Bankr. No. 15-10503-MFW, D.I. 995).

(2) Whether the Bankruptcy Court committed an error of law or an abuse of

discretion in confirming debtors' amended disclosure statement on August 28, 2015 (*id.*

at D.I. 940).

_____

[4]Appellees contend that certain issues raised on appeal were not timely filed.
(*See* Civ. No. 15-946-SLR, D.I. 16, and Civ. No. 15-949-SLR, D.I. 22 at 21)

[5]*See* Civ. No. 15-946 at D.I. 1, 11.

11

(3) Whether the Bankruptcy Court committed an error of law or an abuse of discretion when, on September 15, 2015, it confirmed the amended plan of reorganization filed on August 27, 2015.

Tuttle raises the following issues on appeal:[6]

(1) Whether the Bankruptcy Court committed an error of law or abuse of discretion in the findings of fact, conclusions of law, and order confirming debtors' amended joint Chapter 11 plan of reorganization (Bankr. No. 15-10503-MFW, D.I. 1136).

(2) Whether the Bankruptcy Court committed an error of law or abuse of discretion in denying the party of interest's motion to appoint an examiner with access to and authority to disclose privileged materials (*id.* at 819) and second motion to appoint an examiner with access to and authority to disclose privileged materials including without limitation (*id.* at D.I. 1110).

(3) Whether the Bankruptcy Court committed an error of law or abuse of discretion by overruling the ad hoc committee's objection to debtors' notice of hearing (*id.* at D.I. 969).

## V. DISCUSSION

Appellees argue that the appeal should be dismissed by reason of equitable mootness. Appellants respond that the equitable mootness doctrine is unconstitutional[7]

---

[6]*See* Civ. No. 15-949 at D.I. 1, 16.

[7]The constitutionality of the equitable mootness doctrine was raised in *In re One2One Commc'ns, LLC*, 805 F.3d 428 (3d Cir. 2015). As stated by the Third Circuit, "[b]ecause we have already approved the doctrine of equitable mootness in *Continental*, only the court sitting en banc would have the authority to reevaluate our

12

and the appeal is not equitably moot.[8]  Appellants contend that appellees fail to provide

a concrete showing of how appellants' requested relief (i.e., "merely to retain stock in

the reorganized company") would produce significant harm to other parties or produce

an unwieldy situation for the Bankruptcy Court. (See Civ. No. 15-946-SLR at D.I. 22;

Civ. No. 15-949-SLR at D.I. 20)  Finally, appellants argue that any order vacating

confirmation of the plan of reorganization does not have the ability to affect the success

of the plan because the plan proposed "was nothing more than a visionary scheme."

(Id.)  As discussed below, the court finds appellants' position unavailing.

"'Equitable mootness' is a narrow doctrine by which an appellate court deems it

prudent for practical reasons to forbear deciding an appeal when to grant the relief

requested will undermine the finality and reliability of consummated plans of

reorganization." In re Tribune Media Co., 799 F.3d 272, 277 (3d Cir. 2015). "The party

seeking to invoke the doctrine (i.e., appellees) bears the burden of overcoming the

strong presumption that appeals from confirmation orders of reorganization plans--even

---

prior holding. This court may only decline to follow a prior decision of our court without
the necessity of an en banc decision when the prior decision conflicts with a Supreme
Court decision." Id. at 433 (citations omitted). In One2One, appellant argued that
equitable mootness jurisprudence should be reevaluated in light of the Supreme Court's
decision in Stern v. Marshall, 564 U.S. 462 (2011). The Third Circuit stated that Stern,
alone, did not permit it to depart from Continental. Id.

[8]Most of the issues raised by appellants contain subparts that challenge whether
appellees satisfied the good faith requirements of § 1129(a) of the Bankruptcy Code. A
challenge to the good faith requirement under § 1129(a)(3) significantly impacts the
confirmation plan because the good faith requirement is "a condition of plan confir-
mation." See In re Combustion Eng'g, Inc., 391 F.3d 190, 246 (3d Cir. 2004) ("As a
condition of plan confirmation, a debtor must propose a plan of reorganization 'in good
faith and not by any means forbidden by law.'") (citing 11 U.S.C. § 1129(a)(3)).
Regardless, as will be discussed, the factors considered by the court favor equitable
mootness and dismissal of the appeals.

13

those not only approved by confirmation but implemented thereafter (called "substantial

consummation" or simply "consummation")--need to be decided." *Id.* at 277-78 (citing

*In re SemCrude, L.P.*, 728 F.3d 314, 321 (3d Cir. 2013)).

The Third Circuit first recognized the doctrine of equitable mootness in *In re*

*Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc).  The majority opinion noted

certain factors to consider "in making a mootness call:"

> Factors that have been considered by courts in determining whether it
> would be equitable or prudential to reach the merits of a bankruptcy
> appeal include (1) whether the reorganization plan has been substantially
> consummated, (2) whether a stay has been obtained, (3) whether the
> relief requested would affect the rights of parties not before the court,
> (4) whether the relief requested would affect the success of the plan, and
> (5) the public policy of affording finality to bankruptcy judgments.

*In re Tribune Media Co.*, 799 F.3d at 278 (quoting *In re Continental Airlines*, 91 F.3d at

560 (citation omitted).

Over the years, Third Circuit precedential opinions have refined the doctrine.  As

explained in *Tribune*, "equitable mootness . . . proceed[s] in two analytical steps:

(1) whether a confirmed plan has been substantially consummated; and (2) if so,

whether granting the relief requested in the appeal will (a) fatally scramble the plan

and/or (b) significantly harm third parties who have justifiably relied on plan

confirmation." *In re Tribune* 799 F.3d at 278 (citing *In re SemCrude*, 728 F.3d at 321).

If the confirmed plan has been substantially consummated, the court next determines

whether granting relief will require undoing the plan as opposed to modify it in a manner

that does not cause its collapse. *In re One2One Communications, LLC*, 805 F.3d at

435.

14

The court concludes that the factors considered weigh in favor of applying the

equitable mootness doctrine. First, the plan has been substantially consummated.

"Substantial consummation" is defined as the:

> (A) transfer of all or substantially all of the property proposed by the plan
> to be transferred; (B) assumption by the debtor or by the successor to the
> debtor under the plan of the business or of the management of all or
> substantially all of the property dealt with by the plan; and (C) commence-
> ment of distribution under the plan.

11 U.S.C. § 1101(2).

The Jones declaration submitted by appellees states that, as of the October 22,

2015 effective date, a number of transactions and events had occurred, including:

(1) debtors transferred substantially all of their property under the amended plan by

satisfying certain debt instruments and other secured obligations in accordance with the

terms thereof, eliminating all then-existing liens, and dissolving certain business

entities; (2) reorganized debtors succeeded to debtors' assets, appointed new boards

of directors, and adopted new organizational documents; and (3) distributions under the

amended plan commenced. In addition, reorganized debtors have incurred new first

lien term loans, issued new second lien convertible notes and new warrants, have

entered into a stockholders agreement, and distributed a significant amount of the new

common stock to holders of general unsecured claims entitled thereto, and some new

common stock has been sold to a third party. Finally, reorganized debtors have

distributed approximately $1.8 million of cash to satisfy allowed Bankruptcy Code

§ 503(b)(9) claims and to cure payments with respect to assumed executory contracts

and unexpired leases.

Also, no stay has been obtained.  A stay was sought on October 21, 2015, one

day prior to the effective date, and it was denied on January 22, 2016.[9]  (See Bankr.

No. 15-10503-MFW at D.I. 1172, 1373)  "The existence or absence of a stay is a critical

factor in determining whether to dismiss an appeal under the doctrine of equitable

mootness." In re Grand Union Co., 200 B.R. 101, 105 (citing Continental, 91 F.3d at

561-63).  Indeed, the absence of a stay is so critical to the analysis that even the

unsuccessful pursuit of a stay may favor a finding of equitable mootness.  See

Continental, 91 F.3d at 562 ("'[A] stay not sought, and a stay sought and denied, lead

equally to the implementation of the plan of reorganization.'") (quoting Matter of UNR

Indus., Inc., 20 F.3d 766, 770 (7th Cir. 1994)).  Where no stay has been obtained, the

reorganization plan goes forward, and it is difficult to undo the acts of third parties

proceeding under the plan without prejudicing those third parties.  See generally

Continental, 91 F.3d at 561–63; In re Highway Truck Drivers & Helpers Local Union No.

107, 888 F.2d 293, 297 (3d Cir. 1989).  Such is the case here.

The amended plan at bar involved intricate transactions, and appellees (who

bear the burden to demonstrate that prudential factors weigh in their favor, see In re

Semcrude, 728 F.3d at 321) submitted the Jones declaration which provides ample

evidence that it would be difficult to unravel or retract the amended plan.  The amended

plan was the result of compromises and agreements that took place over many months

among debtors, RSA parties, the creditors committee, and the equity committee.  The

---

[9]The denial of the motion to stay is the subject of the third bankruptcy appeal
filed by Tuttle on February 1, 2016, Tuttle v. Allied Nevada Gold Corp., Civ. No. 16-058-
SLR.

16

record as above described reflects that this case involves a sufficiently complex

reorganization. *See Continental*, 91 F.3d at 560-61 (reversal of a confirmation order is

more likely to lead to an inequitable result "where the reorganization involves intricate

transactions or where outside investors have relied on the confirmation of the plan");

*see also Nordhoff Investments, Inc. v Zenith Electronics Corp.*, 258 F.3d 180, 186 (3d

Cir. 2001) (finding that plan that involved hundreds of millions of dollars, the issuance of

unretractable bonds, and restructuring the debt, assets, and management of a major

corporation "could [not] be reversed without great difficulty and inequity").

Appellants' primary objection is that they are entitled to a greater recovery

because the amended plan does not sufficiently value debtors and, in turn, holders of

canceled common stock who include appellants. However, appeals challenging plan

valuations on this basis have been rejected under the doctrine of equitable mootness

because the proposed relief (*i.e.*, revaluation of the company) would "likely topple the

delicate balances and compromises struck by the [p]lan." *Grimes v. Genesis Health

Ventures, Inc.*, 280 B.R. 339, 346 (D. Del. 2002); *see also Tribune*, 799 F.3d 281

(holding appeal is equitably moot because relief requested would "effectively undermine

the [s]ettlement" underlying the plan and, "as a result, recall the entire plan for a redo").

In addition, appellants' requested relief would detrimentally affect the rights of

numerous third parties not before the court. Equitable mootness "protects the interests

of non-adverse third parties who are not before the reviewing court but who have acted

in reliance upon the plan as implemented." *Continental*, 91 F.3d at 362 (citation

omitted). The requested relief would adversely affect third parties that acted in reliance

17

on the amended plan's confirmation, including exit funding lenders as well as recipients of the distributions and issuances of new common stock and new warrants and parties who may have obtained the instruments through trades on the open market. In addition, through required approvals in accordance with the stockholders agreement, there has been one trade of the new common stock to a third party.

Finally, public policy favors dismissal. "The public policy of affording finality to bankruptcy judgments is . . . the lens through which the other equitable mootness factors should be viewed." *Nordhoff*, 258 F.3d at 190. There is a "strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization" in bankruptcy proceedings. *Continental*, 91 F.3d at 565. "[T]he importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine." *Id.* Given the number of parties involved in the negotiation, approval, and substantial consummation of the amended plan, the court concludes that public policy favors leaving the amended plan undisturbed, appellants' objections notwithstanding.

## VI. CONCLUSION

For the above reasons, the court will deny Tuttle's motions to consolidate the appeals, Civ. No. 15-946-SLR at D.I. 26; Civ. No. 15-949-SLR at D.I. 32. In addition, based on the reasoning above, the court concludes that the relevant factors weigh in favor of dismissing the instant appeals on the grounds of equitable mootness.

An appropriate order shall follow.

18